UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JUSTIN M. SCOTT,

     Plaintiff,

     v.

PUTNAM, LLC D/B/A PUTNAM
INVESTMENTS, PUTNAM INVESTMENTS,
INC., PUTNAM INVESTMENT
MANAGEMENT, LLC, MARSH &
MCLENNAN COMPANIES, INC., JOHN DOE
PLAN ADMINISTRATORS 1-12

     Defendants,

Civil Action No. 11-11082-RWZ

**LEAVE TO FILE GRANTED
ON JULY 27, 2011**

## SECOND AMENDED COMPLAINT AND JURY DEMAND

By this action, plaintiff Justin M. Scott seeks to recover compensation wrongfully

withheld from him by Putnam, LLC d/b/a Putnam Investments, Putnam Investments, Inc.,

Putnam Investment Management, LLC (together, "Putnam"), Marsh & McLennan Companies,

Inc. ("MMC") and/or the John Doe plan administrators (yet unknown) who administered

compensation plans for Putnam and MMC. Mr. Scott worked for Putnam for over 15 years, and,

during that time, was paid through a combination of base salary, bonuses, stock and options.

Putnam, consisting of mutual fund and investment management companies, provided its

employees with an array of deferred compensation plans that afforded valued employees a

method to receive certain tax benefits by deferring earned compensation and provided incentives

to employees to remain loyal to Putnam. Over the years, and at Putnam's encouragement, Mr.

Scott elected to defer earned compensation under these plans.

After inducing Mr. Scott to delay a desired early retirement, Putnam agreed that Mr. Scott would retire at year-end 2003. As part of the agreement, Putnam's former CEO, Charles Haldeman, personally told Mr. Scott that when he separated from the company, he would receive all of his deferred compensation. Other Putnam executives repeatedly told Mr. Scott his separation from the company would be deemed a "retirement." Under the compensation plans, when an employee retires, he is entitled to maximum benefits under the plans.

Instead of honoring its agreement, on December 1, 2003, Putnam "terminated" Mr. Scott without warning, just weeks before Mr. Scott was to retire pursuant to agreement, in a blatant attempt to avoid having to pay Mr. Scott money that he had earned but not yet been paid. Putnam, MMC and the plan administrators continue to wrongfully withhold Mr. Scott's earned compensation.

## PARTIES

1.    Plaintiff Justin M. Scott maintains residences in Marblehead, Massachusetts and Greenwich, Connecticut.

2.    Defendant Putnam, LLC d/b/a Putnam Investments is, upon information and belief, a Delaware limited liability company having its principal place of business at One Post Office Square, Boston, Suffolk County, Massachusetts.

3.    Putnam Investments, Inc. is, upon information and belief, a Delaware corporation having its principal place of business at One Post Office Square, Boston, Suffolk County, Massachusetts. Putnam Investments, Inc. is, on information and belief, successor to The Putnam Companies, Inc.

4.    Putnam Investment Management, LLC (together with Putnam, LLC and Putnam Investments, Inc., referred to herein as "Putnam") is, upon information and belief, a Delaware

limited liability company having its principal place of business at One Post Office Square, Boston, Suffolk County, Massachusetts.  Putnam Investment Management, LLC is a registered investment adviser.  Putnam, LLC, Putnam Investments, Inc. and Putnam Investment Management, LLC are related and/or affiliated entities within the Putnam family of companies.

5.     Defendant Marsh & McLennan Companies, Inc. ("MMC") is, upon information and belief, a Delaware corporation having its principal place of business at 1166 Avenue of the Americas, New York, New York.  Upon information and belief, Putnam was, at all times relevant to this Complaint, a wholly-owned subsidiary of MMC and MMC conducted business through Putnam's Boston office, located at One Post Office Square, Boston, Suffolk County, Massachusetts.

6.     The John Doe Plan Administrators are, on information and belief, either Putnam or MMC committees, or individual directors or officers, appointed by Putnam or MMC to manage the various plans.

## JURISDICTION

7.     The Defendants removed this action from the Suffolk County Superior Court pursuant to 42 U.S.C. §1441, on the grounds that three of the deferred compensation plans at issue are allegedly subject to the Employee Retirement Income Security Act of 1974 (29 U.S.C. §§1101-1461) ("ERISA").

## BACKGROUND

### I.     JUSTIN M. SCOTT'S EMPLOYMENT AT PUTNAM

### A.     Justin Scott's Contributions to Putnam

8.     In 1988, Mr. Scott joined Putnam and a team of two other portfolio managers to rebuild Putnam's International Equity group.  This team founded the International Equity Group

("IEG"). Mr. Scott's initial focus was on European equity portfolios and defining the Group's stock selection process.

9.    When Mr. Scott joined Putnam, IEG assets were only $40 million and the total assets under management at Putnam were approximately $35 billion. Between 1988 and 1994 IEG produced consistently superior investment returns for its clients. As a result, by 1994 IEG had grown substantially and was managing $4 billion in assets. Mr. Scott was instrumental to this success, and in 1994 he was made Director of IEG.

10.    In 1996 Mr. Scott was promoted to Chief Investment Officer of the Core International Group ("CIG"). The team continued to produce exceptional and consistent investment results for its clients and mutual fund shareholders. In 1998 CIG was expanded to include domestic equities and was renamed the Global Core Group ("GCG"). By this time Mr. Scott had become well-known in the industry for his exceptional capabilities in fund management.

11.    GCG was very successful, and by 2000 the group was managing $100 billion in assets. In addition to the funds and investment products he had created and managed, Mr. Scott was also asked to assist in reviewing and turning around underperforming portfolios managed by other groups within Putnam, thus evidencing Putnam's confidence in his abilities, consistent with Mr. Scott's excellent performance reviews throughout his tenure at Putnam.

12.    In mid-2002, Mr. Scott was asked if he was interested in the position of Co-Head of Investments. Mr. Scott declined, expressing a wish to transition to a part-time position or to retire in order to permit him to spend more time with his son. Thereafter, in December 2002, Mr. Scott was asked by Mr. Haldeman and Stephen Oristaglio, who were then the Co-Heads of Investments, to remain with Putnam an additional year to in order to turn around the

underperforming Specialty Growth and Mid Cap Growth divisions of Putnam.  After being urged

by these and various other executives to take over the management of these divisions which were

critical to the maintenance of Putnam's reputation, Mr. Scott put his career and personal plans on

hold and accepted this undertaking, with the understanding that he could retire once these

divisions were back on track.  Mr. Scott understood the task would be difficult, but he wanted to

improve the divisions out of loyalty to Putnam.

13.    In mid 2003, Mr. Scott met with Mr. Oristaglio and Mr. Haldeman to discuss the

good progress the divisions had made and Mr. Scott's future plans.  After 15 years of working to

build strong portfolios and management styles and processes for various divisions and individual

portfolios, Mr. Scott wished to enter into early retirement.  In June 2003, Mr. Haldeman and Mr.

Oristaglio, along with Lawrence Lasser, then CEO of Putnam, agreed that in exchange for his

work on the Growth divisions, Mr. Scott would be permitted to retire by the end of 2003 or

March 2004, with the timing to depend on the progress of the divisions.  Mr. Scott willingly

agreed to make himself available to Putnam on an ongoing basis, if necessary, as a consultant.

14.    Mr. Scott was never cited for any ethical lapse or violation of rules or regulations

while employed at Putnam.

### B.    Mr. Scott's Compensation

15.    Mr. Scott's compensation contained various components: a base salary, annual

bonuses, profit sharing and awards of stock and options.

16.    Mr. Scott participated in the following deferred compensation plans while at

Putnam:

    i.   Putnam Investments Trust Equity Partnership Plan ("Putnam Stock Plan");

    ii.  Putnam Equity Partnership Voluntary Dividend Equivalent Deferral Plan
       ("Voluntary Dividend Deferral Plan")

    iii.   Putnam Profit Sharing Retirement Plan ("Putnam PSP");

    iv.   Putnam Investments, Inc. Executive Deferred Compensation Plan ("Putnam EDCP");

    v.   Putnam Investments, Inc. Partners Incentive Compensation Plan ("Partners Plan");

    vi.   Putnam Investments, Inc. Profit Growth Incentive Compensation Plan ("Profit Growth Plan");

    vii.   Putnam Voluntary Deferral Plan ("Partners Voluntary Deferral");

    viii.   Executive Deferred Co-Investment Program ("Co-Investment Program");

    ix.   Marsh McLennan Companies, Inc. 2000 Employee Incentive and Stock Award Plan ("MMC Stock Plan"); and

    x.   Marsh & McLennan Companies, Inc. U.S. Employee Cash Bonus Award Voluntary Deferral Plan; ("MMC Voluntary Deferral").

17.   The MMC Stock Plan and Putnam Stock Plan governed grants of stock and/or options to employees, which grants were made pursuant to individual award agreements with employees. Such awards of stock and/or options were part of an employee's compensation package and vested over a period of years after the grant. In the event of a change of control, as defined in the plans, all unvested awards (stock and options) were to vest and be paid out to participants. Lawrence Lasser, who was CEO of Putnam until mid-2003, issued a memorandum in January 2002 concerning the Putnam Stock Plan, stating that, even after shares vested and could be redeemed with cash pay-outs withdrawn from the plan, Putnam's "informal policy is to encourage recipients to hold Putnam equity . . ." and the Putnam Stock Plan should be considered a "long-term incentive vehicle."

18.   The Putnam PSP and Putnam EDCP plans provided a mechanism for participants to contribute a portion of their earned and payable salaries to tax-deferred accounts for retirement (akin to a 401k). Additionally, the Putnam PSP and Putnam EDCP plans governed certain Putnam contributions to such deferral accounts.

19.    The Partners Plan and Profit Growth Plan each provided for bonuses and investment mechanisms available to participants.  Bonuses awarded under the plans vested ratably over a period of years.  The Profit Growth Plan awards were largely discretionary based on a participant's performance.  The Partners Plan awards were based on a participant's allocated percentage interest in profits of the Putnam companies, subject to a performance multiple.

20.    The Partners Voluntary Deferral and MMC Voluntary Deferral plans provided a mechanism for participants to voluntarily defer portions of their earned, vested bonuses, *e.g.* bonuses vesting under the Partners Bonus and Profit Growth Bonus plans, into tax-deferred accounts.  Statements to participants indicated these amounts were fully vested.

21.    The Voluntary Dividend Deferral Plan allowed participants to voluntarily defer dividends from the Putnam Stock Plan into tax deferred accounts.  Statements to participants indicated these amounts were fully vested.

22.    The Co-Investment Program enabled participants to defer certain bonus amounts and to participate in the Putnam/Thomas H. Lee Fund V.

23.    The plans contain various provisions governing pay out of deferred compensation upon termination of a participant's employment.  When an employee retires, he/she is entitled to all vested and unvested deferred compensation and a pro rata portion of his/her bonus for the year of retirement.  When employment is voluntarily or involuntarily terminated, some portions of the deferred compensation under certain plans are forfeited.  When an employee is involuntarily terminated for cause, even more compensation under certain plans is subject to forfeiture.  A significant portion of Mr. Scott's compensation at issue, however, consists of pre and post-tax amounts contributed from his earned and payable salaries and bonuses over many years which amounts are not subject to forfeiture regardless of the circumstances of his

separation from Putnam, and which should have been turned over to him within a reasonable period of time after his separation, as provided in the plans.

24.   Over the course of his 15 years of dedicated service with Putnam, Mr. Scott was awarded stock, options, bonuses and profit sharing amounts under these plans, and he deferred some vested amounts pursuant to the deferral options that Putnam made available to him.  Upon information and belief, Putnam's deferred compensation program was intended as a tool by Putnam and MMC to keep their best investment officers employed at Putnam.  Participation in the plans and investments in Putnam funds also conveyed confidence in the company and its investment products to other employees and the market.  Putnam encouraged its employees, including Mr. Scott, to invest their compensation via these plans, including through memoranda targeted to employees, such as Mr. Lasser's 2002 memorandum concerning the Putnam Stock Plan.

25.   These non-qualified deferred compensation plans impart certain tax benefits.  According to the express terms of these plans, Putnam/MMC made promises to pay certain amounts to Mr. Scott.

26.   Aside from the stock/option plans, each of the plans provided a means for valuing the participant's deferred compensation.  Each plan allowed participants to make allocation requests to the plan administrator, offering a selection of Putnam mutual funds and MMC common stock.  Plan administrators or other Putnam/MMC personnel reviewed, considered whether to approve, and processed the requests.  The plan documents authorized Putnam/MMC to restrict the allocation request process, including placing limits on the number of requests.

27.   Mr. Scott had no authority under these plans to purchase any mutual funds shares or even to require that Putnam/MMC purchase mutual fund shares on his behalf.  His sole right as a

participant was to *propose* how his deferral accounts would be *considered to be invested.* Whether his proposal was accepted by Putnam rested within the sole discretion of the Director of Compensation or its Chief Financial Officer. Even if those officers exercised their discretion to accept a proposal, there was no requirement under the relevant plan documents that Putnam actually purchase any shares of mutual funds recommended by Mr. Scott.

### C.     Justin Scott Reallocation Requests in Putnam/MMC Plans

28.   Up until 1997, Putnam/MMC had allowed two exchange requests per compensation plan, per quarter, and had limited the number of exchanges a plan participant could propose to six per plan per year. In 1997, Putnam removed this restriction, sending multiple notices concerning this policy change to employees (one for each plan to each plan participant, including Mr. Scott). Each exchange request still had to be submitted for approval by the plan administrators or other Putnam/MMC personnel. On information and belief, this change in policy increased the number of exchange requests submitted by Putnam employees.

29.   Mr. Scott's allocation requests were all properly submitted to, and received, processed and approved by Putnam, MMC and/or the plan administrators. His allocation requests complied with Putnam's policies at all times. Mr. Scott made various allocation requests with respect to his deferred compensation over the years.

30.   March through May of 2000 was a very volatile time in the U.S. and foreign markets. During this period of volatility, Mr. Scott made reallocation requests from late March through late May 2000. All of his requests complied with Putnam's policy which, at that time, limited the requests to one per plan per day. All were reviewed and approved by Putnam and/or MMC. Mr. Scott's reallocation requests during this period resulted in an overall net loss.

31.   On information and belief, shortly after Mr. Scott made these allocation requests, they were thoroughly reviewed in due course by senior members of a number of Putnam departments and committees, including members of its Code of Ethics Oversight Committee. These individuals determined what action, if any, should be taken by Putnam with respect to Mr. Scott's exchange activity, as they were required to do for all exchange requests submitted by Putnam employees.

32.   Thereafter, the determination of these departments and committees was communicated to Mr. Scott.  On June 14, 2000, Mr. Scott met with Ian (Tim) Ferguson, who was then the Head of Investments at Putnam and a member of Putnam's Operating Committee. During this meeting, Mr. Ferguson raised the exchange requests Mr. Scott had recently made. While Mr. Ferguson did not identify any specific number of exchanges that would be inappropriate, Mr. Ferguson stated his belief that senior executives could "set a good example" by voluntarily limiting their exchanges to a level below the maximum permitted under Putnam policy.  Mr. Scott stated he had already discontinued his exchange requests and that he wanted to meet the highest standard and set a good example.  He further stated that, in the future, he would seek to minimize his exchanges.  Mr. Ferguson was pleased by this response, and he gave no indication that any reprimand, formal or informal, would follow, and in fact none did.

33.   This treatment was consistent with Putnam's policy at that time for dealing with frequent trading by employees or customers.  If Putnam detected such trading in either a customer or employee account, Putnam would warn the trader and then take further action only if the warning was ignored.

34.     After he met with Mr. Ferguson in June 2000, Mr. Scott made no short term round trips in his deferred compensation accounts, and Mr. Scott supported all efforts to encourage less short term activity in Putnam funds by other employees and external shareholders.

35.     This single conversation was the action that Putnam had decided, after review, was appropriate.  Aside from this conversation with Mr. Ferguson and until this issue was reviewed again in 2003, as discussed below, no one at Putnam/MMC ever spoke to Mr. Scott regarding the number or frequency of his reallocation requests.  Prior to 2003, no one ever suggested to him that his activity violated any Putnam rule, regulation or code, and in fact it did not.

36.     Following his meeting with Mr. Ferguson, Mr. Scott understood that Putnam had fully investigated the matter and determined it would take no adverse action with respect to Mr. Scott or his employment.  Reasonably relying on Putnam's review and action with respect to his 2000 exchange activity, Mr. Scott continued to work for Putnam, he continued to defer earned and payable compensation as encouraged to do so by Putnam, and he rejected offers to join other investment firms.  Mr. Scott also continued to receive favorable annual reviews and assessments from Putnam's senior management for both performance and integrity.

37.     In subsequent years, Mr. Scott was presented with at least two opportunities for equivalent employment with other investment firms in New York.  These opportunities were attractive to Mr. Scott because the location of the firms' offices, in New York City, would eliminate Mr. Scott's need to commute to Boston and enable him to be closer to his family in Connecticut; however, Mr. Scott had worked for Putnam for many years, believed strongly in what Putnam was doing for its clients, and wished to remain at Putnam.

38.     Mr. Scott discussed one of these employment opportunities with Mr. Ferguson.  Mr. Ferguson did not state or indicate to Mr. Scott that his prior exchange request activity exposed

him to potential termination from Putnam.  Mr. Scott relied on Putnam's representations that Mr. Scott remained a valued employee, including Mr. Ferguson's omission of any negative statement concerning Mr. Scott during the meetings referenced herein, and Mr. Scott declined these other employment opportunities.

## II.    REGULATORY AND INTERNAL INVESTIGATIONS

39.    In the second half of 2003, the SEC commenced investigations into "short term trading" and "market timing" allegations at several mutual fund companies, including Putnam. During these investigations, the SEC acknowledged that market timing and excessive short term trading were not illegal.  Indeed, the SEC had long been aware that many investors capitalized on the liquidity of mutual funds by trading frequently in mutual fund shares, and by 2003 there was no rule, regulation, or statute regulating the frequency of mutual fund trading.

40.    In the midst of investigations into trading activity by Putnam clients in Putnam mutual funds, the SEC and the Massachusetts Securities Division ("MSD") began investigating employee exchange request activity at Putnam in early September 2003.  During these investigations, the regulators reviewed whether Putnam employees had engaged in excessive short term trading in Putnam funds during a seven-year period, from 1997 through 2003.

41.    In response to these regulatory inquiries, Putnam conducted an internal investigation with the assistance of outside counsel.

42.    During the internal investigation, Mr. Scott was interviewed about the allocation requests he had made in 2000.  Although Mr. Scott had received no reprimand or warning regarding his allocation requests at any time, Mr. Scott told management he would be willing to leave the company sooner than previously agreed, if it would assist Putnam in dealing with the pending regulatory matters.  Putnam accepted this offer.

43.     Subsequently Mr. Scott learned that his allocation request activity from 1997 through 2003 paled in comparison to the activity of many other employees. From 1997 to 2003, Mr. Scott did not even rank in the top 150 employees in terms of overall exchange request activity. Although hundreds of Putnam employees had engaged in frequent trading in Putnam funds, no one at Putnam made any mention of this fact to Mr. Scott at the time.

44.     Mr. Scott met with various individuals in October of 2003 to discuss arrangements for his departure from Putnam. Early in his discussions with various executives, and continuously thereafter, he was assured his separation would be a "retirement" and that he would receive all of his vested and unvested deferred compensation.

45.     In October 2003, William Woolverton, then Putnam's general counsel, called Mr. Scott to explain the terms of Mr. Scott's impending retirement. Mr. Woolverton told Mr. Scott that he would receive all of his deferred compensation. Mr. Scott agreed to the terms.

46.     Around this same time, Mr. Lasser, Mr. Haldeman and Mr. Oristaglio all confirmed to Mr. Scott that he would be retiring.

47.     After Mr. Scott was told his separation would be a retirement, he was working late one evening in his office on transition plans for the groups that he had been managing. Mr. Haldeman, who would succeed Mr. Lasser as CEO, entered Mr. Scott's office and, after he had discussed some of the transition plans and mentioned health coverage, he personally told Mr. Scott that he had earned all of his deferred compensation and would "get every cent," and that if Mr. Scott had any questions about his deferred compensation, he should "come to me personally." Mr. Haldeman thus confirmed Mr. Scott's understanding that Putnam intended to pay Mr. Scott all of his deferred compensation upon his separation from the company.

48.     Mr. Scott relied on these representations and did not seek to liquidate or withdraw any funds from his deferred compensation accounts, nor did he seek to alter his salary deferral elections and, consequently, he continued to defer portions of his earned compensation into these accounts.  Mr. Scott continued to work diligently for Putnam.

49.     Mr. Scott worked long hours to make all the appropriate arrangements to enable a smooth transition when he did retire, the timing of which was still being discussed among Putnam management.  Mr. Haldeman and Mr. Oristaglio, along with others, were aware of Mr. Scott's efforts in this regard, and they expressed their gratitude and regret that Mr. Scott's retirement had been impacted by the regulatory matters.  Ultimately, Putnam's management decided Mr. Scott would retire at the end of 2003.

50.     On October 28, 2003, while Mr. Scott was out of the office on a planned family vacation, both the SEC and MSD initiated formal proceedings against Putnam.  Both proceedings alleged that Putnam had knowledge of allegedly inappropriate employee trading in Putnam funds in 2000 and that Putnam lacked the controls necessary to deter and detect employee trading, among other allegations.  Putnam ultimately admitted wrongdoing in settling these regulatory actions.

51.     That same day, the SEC filed a civil injunctive action against Mr. Scott and another former Putnam employee in federal court pertaining to their alleged improper trading in Putnam funds.  This action was resolved without any finding or admission of wrongdoing by Mr. Scott.

52.     When Mr. Scott returned from his vacation, he was asked to take a leave of absence but to continue to be available to work from home.  Mr. Scott continued to work on recruitment matters while he was on leave.  During this period, no one told Mr. Scott that Putnam had any intent to seek to alter the terms of Mr. Scott's anticipated departure from Putnam.

53.     Putnam completed its internal investigation in October 2003.  On information and belief, Putnam interviewed numerous employees in connection with this investigation, including Mr. Scott, concerning their exchange requests in Putnam funds.

54.     On November 3, 2003, Mr. Haldeman was appointed to replace Mr. Lasser as CEO of Putnam.

### III.     PUTNAM "TERMINATES" MR. SCOTT AND HIS EARNED COMPENSATION IS WITHHELD BY PUTNAM AND MMC.

55.     In the wake of the regulatory inquiries, Mr. Scott offered to accelerate his planned retirement if it would benefit Putnam.  Putnam's general counsel told Mr. Scott that Putnam senior management had decided that his retirement date could wait until the end of 2003, saying, "We are running Putnam, not the SEC."  Mr. Scott thus reasonably understood that notwithstanding how Putnam might portray his ultimate separation in the press or to the SEC, Putnam would honor its agreement with Mr. Scott that his separation would be a retirement.

56.     Ultimately, despite the verbal agreement that Mr. Scott had with Putnam management that Mr. Scott would be permitted to retire at the end of 2003, on December 1, 2003, weeks after Putnam settled the cease and desist proceedings, Mr. Scott's employment ended.  The letter from Putnam's Managing Director of Human Resources stated that "following additional review of the relevant facts, and as events unfold, we will be in a position to discuss further the terms of your termination from Putnam, and the characterization and treatment of your termination, as well as the timing and amount of any payments under all other compensation plans and programs of Putnam and MMC."

57.     Based on the representations that had been made to him prior to December 1, 2003, the consistency of the timing of Mr. Scott's "termination" with his prior discussions with Putnam management, including Mr. Haldeman, and the treatment of Mr. Scott's deferred

compensation in the days, weeks and months following his separation from Putnam, Mr. Scott continued to believe that he would receive all of his deferred compensation as if he had retired. Mr. Scott did not seek to withdraw any of his deferred compensation upon receipt of the December 1, 2003 letter, and he waited for Putnam, MMC and/or the plan administrators to distribute his earned compensation under the various plans.

58.     In February 2004, Mr. Scott received a letter from Putnam indicating that it was creating an escrow account into which dividends earned on shares Mr. Scott held under the Putnam Stock Plan and MMC Stock Plan would be paid "until the parties' respective rights are determined for purposes of compensation plans of Putnam . . . ." Mr. Scott continued to believe Putnam, MMC and/or the plan administrators would soon pay out his deferred compensation pursuant to Putnam's earlier agreement, and he did not seek to withdraw funds from any of his accounts.

59.     Initially, Mr. Scott continued to receive account statements, and was able to access his plan accounts and make deferral requests (which were reviewed and effected by Putnam), for months after his termination, confirming his understanding of Putnam's representations that his separation was being treated as a retirement. These statements did not reveal any withdrawals or "forfeiture" of any of Mr. Scott's deferred compensation. However, these statements did disclose to Mr. Scott that he was not awarded his 2003 bonus when it was due, in March 2004.

60.     After Putnam failed to award Mr. Scott his 2003 bonus, failed to pay Mr. Scott deferred compensation required to be distributed to retirees pursuant to the plans, and failed to communicate the terms on which Mr. Scott's deferred compensation would be paid, Mr. Scott demanded payment of all of his deferred compensation. Nonetheless, Putnam, MMC and the

plan administrators did not pay Mr. Scott *any* of his deferred compensation whatsoever, but withheld all of this compensation from Mr. Scott for years.

61.     Finally, in 2007, Mr. Scott was able to withdraw his Putnam PSP deferred compensation, consisting of salary deferrals and profit sharing awards, a fraction of the total owed to him.  Mr. Scott has not been able to obtain any of his compensation from any of his other accounts.

62.     In or around July 2007, Putnam placed a "for cause" termination letter in Mr. Scott's personnel file, which indicated that this characterization would be determinative under the deferred compensation plans.

63.     On August 2, 2007, MMC sold Putnam to a subsidiary of Power Corporation of Canada ("Power Corp."), effecting a "change of control" under the Putnam Stock Plan and triggering Putnam's obligation to pay out all amounts deferred under the Putnam Stock Plan to plan participants.  To date, however, Mr. Scott has not received any pay out from this plan, or the other plans as stated herein.

64.     On information and belief, Putnam, MMC and the plan administrators are relying on the "for cause" termination letter placed in Mr. Scott's personnel file in the summer of 2007 in order to avoid having to pay out Mr. Scott's deferred stock and option grants under the Putnam Stock Plan, which would have been triggered by MMC's sale of Putnam to Power Corp.'s subsidiary in August 2007.

65.     Until approximately 2008, Mr. Scott had been able to monitor the performance of his deferred compensation "accounts" online and make allocation requests, which were honored, even following his separation from Putnam.  The investment elections available to Mr. Scott, however, were limited by the terms of the plans.  The accounts continued to show that all of his

compensation (except the 2003 bonus, never awarded) remained in his accounts and was not forfeited. Mr. Scott stopped receiving account statements in 2008.

66. Although much of Mr. Scott's deferred compensation was not forfeitable even in the event of a legitimate "for cause" termination, Putnam, MMC and the plan administrators have not paid Mr. Scott any of his deferred compensation other than as stated herein. On information and belief, although Putnam has not paid Mr. Scott his deferred compensation owed, in spite of his request, Putnam has also not acted to forfeit Mr. Scott's deferred compensation, and that compensation remains segregated in book entry accounts pursuant to Mr. Scott's last-submitted allocation requests.

67. Effective August 12, 2006, Putnam (on behalf of all its affiliated entities), MMC, Mr. Scott and another former Putnam employee entered into a tolling agreement, which tolled the statute of limitations on any claims they might have against one another as of that date, including specifically concerning the deferred compensation plans, until the tolling agreement were terminated under its provisions. The tolling agreement was terminated on December 21, 2010, and under its provisions, the statute of limitations resumed on January 20, 2011.

### Count I
### Breach of Contract – Employment Agreement
(Scott v. Putnam)

68. Plaintiff realleges and incorporates each of the paragraphs above as if fully restated herein.

69. Putnam contracted with Mr. Scott and agreed to provide Mr. Scott with certain compensation, deferred compensation, bonuses and retirement benefits in exchange for Mr. Scott's services as an employee of Putnam.

70. Mr. Scott performed all agreed upon services.

18

71.   Putnam breached its agreement by failing to compensate Mr. Scott according to the agreement of the parties.

72.   Mr. Scott has been damaged by the conduct of Putnam in the amount of his compensation, deferred compensation, bonuses, retirement benefits, losses and/or reduced gains and pre-judgment interest in an amount to be determined at trial with regard to contributions that were made or should have been made to the non-ERISA plans, including but not limited to, on information and belief, the Putnam Stock Plan, Voluntary Dividend Deferral Plan, Partners Plan, Profit Growth Plan, Co-Investment Program, MMC Stock Plan and MMC Voluntary Deferral Plan.

**Count II**
**Breach of Contract – Retirement Agreement**
**(Scott v. Putnam)**

73.   Plaintiff realleges and incorporates each of the paragraphs above as if fully restated herein.

74.   Putnam contracted with Mr. Scott and agreed to provide Mr. Scott with certain compensation, deferred compensation, bonuses and retirement benefits in exchange for Mr. Scott's services as an employee of Putnam and in light of his impending retirement.

75.   Mr. Scott performed all agreed upon services and was ready and willing to retire under this agreement.

76.   Putnam failed to compensate Mr. Scott according to the agreement of the parties, terminated Mr. Scott, and has subsequently maintained he was terminated for cause.  Putnam therefore breached the agreement.

77.   Mr. Scott has been damaged by Putnam's conduct in the amount of his compensation, deferred compensation, bonuses, retirement benefits, losses and/or reduced gains and pre-judgment interest in an amount to be determined at trial with regard to contributions that

were made or should have been made to the non-ERISA plans, including but not limited to, on information and belief, the Putnam Stock Plan, Voluntary Dividend Deferral Plan, Partners Plan, Profit Growth Plan, Co-Investment Program, MMC Stock Plan and MMC Voluntary Deferral Plan.

## Count III
### Breach of Contract – Plan Agreements
#### (Scott v. Putnam, MMC, John Doe Plan Administrators)

78.    Plaintiff realleges and incorporates each of the paragraphs above as if fully restated herein.

79.    Putnam and MMC contracted with Mr. Scott through the Plan Agreements to provide Mr. Scott with certain compensation, deferred compensation, bonuses and retirement benefits in exchange for Mr. Scott's services as an employee of Putnam.  Putnam and/or MMC appointed John Doe Plan Administrators to administer some or all of the plans.

80.    Mr. Scott performed all agreed upon services.

81.    Putnam, MMC and/or the Plan Administrators failed to compensate Mr. Scott according to the agreements and therefore breached those agreements.

82.    Mr. Scott has been damaged by the conduct of Putnam, MMC and/or the John Doe Plan Administrators in the amount of his compensation, deferred compensation, bonuses, retirement benefits, losses and/or reduced gains and pre-judgment interest in an amount to be determined at trial with regard to contributions that were made or should have been made to the non-ERISA plans, including but not limited to, on information and belief, the Putnam Stock Plan, Voluntary Dividend Deferral Plan, Partners Plan, Profit Growth Plan, Co-Investment Program, MMC Stock Plan and MMC Voluntary Deferral Plan.

**Count IV**
**Breach of the Covenant of Good Faith and Fair Dealing**
**(Scott v. Putnam, MMC, John Doe Plan Administrators)**

83.     Plaintiff realleges and incorporates each of the paragraphs above as if fully restated herein.

84.     The conduct of Putnam, MMC and the John Doe Plan Administrators, as described herein, breached the covenant of good faith and fair dealing implied in every contract.

85.     Mr. Scott has been damaged in an amount to be determined at trial with regard to the non-ERISA plans, including but not limited to, on information and belief, the Putnam Stock Plan, Voluntary Dividend Deferral Plan, Partners Plan, Profit Growth Plan, Co-Investment Program, MMC Stock Plan and MMC Voluntary Deferral Plan.

**Count V**
**Promissory Estoppel**
**(Scott v. Putnam)**

86.     Plaintiff realleges and incorporates each of the paragraphs above as if fully restated herein.

87.     Putnam, by oral representations and conduct, represented to Mr. Scott that it would not take any adverse action with respect to Mr. Scott's employment based on the exchange requests made by Mr. Scott in 2000.

88.     Mr. Scott relied to his detriment on Putnam's representations in this regard by continuing to work for Putnam in exchange for, in part, deferred compensation that would vest over a period of years.

89.     Putnam also promised Mr. Scott that he would receive all of his deferred compensation upon his separation from the company at the end of 2003.

90.   Mr. Scott reasonably relied to his detriment on Putnam's representations by not seeking to withdraw or liquidate any of his deferred compensation from his deferred compensation accounts and by continuing to work for Putnam.

91.   Even when Putnam "terminated" Mr. Scott on December 1, 2003, it did not indicate that Mr. Scott's deferred compensation would be treated in any fashion other than as if Mr. Scott had retired, and it certainly did not notify him that it was terminating Mr. Scott for cause.  In reliance on this representation, Mr. Scott did not act to withdraw any of his deferred compensation.

92.   Nonetheless, in spite of the fact that Mr. Scott was due benefits under his plans in the event of his retirement or even non-cause termination, Putnam has wrongfully withheld most of Mr. Scott's deferred compensation and, on information and belief, now contends that much of Mr. Scott's deferred compensation is forfeitable due to his termination for cause.

93.   By reason of the foregoing, Mr. Scott has suffered damages in an amount to be determined at trial with regard to contributions that were made or should have been made to the non-ERISA plans, including but not limited to, on information and belief, the Putnam Stock Plan, Voluntary Dividend Deferral Plan, Partners Plan, Profit Growth Plan, Co-Investment Program, MMC Stock Plan and MMC Voluntary Deferral Plan.

**COUNT VI**
**ERISA (29 U.S.C. §1132)**
**(Scott v. Putnam, John Doe Plan Administrators)**

94.   Plaintiff realleges and incorporates each of the paragraphs above as if fully restated herein.

95.   The Defendants contend the Putnam PSP, Putnam EDCP and Partners Voluntary Deferral Plan are subject to ERISA.  Mr. Scott does not concede these plans are governed by

ERISA, but asserts this claim under ERISA in the alternative to his state law claims asserted above and in Count VII below.

96.   Mr. Scott is entitled to benefits under the Putnam PSP, Putnam EDCP and Partners Voluntary Deferral Plan.

97.   Although Mr. Scott was able to withdraw his contributions to the Putnam PSP in 2007, for several years he was wrongfully denied access to benefits he was owed.

98.   With respect to the Putnam EDCP and Partners Voluntary Deferral Plan, Mr. Scott has made a claim for benefits, but Putnam and/or the John Doe Plan Administrators have denied Mr. Scott's claim for benefits and have withheld any and all benefits due to Mr. Scott under these plans.

99.   Mr. Scott has suffered damages in an amount to be determined at trial due to the wrongful withholding of benefits he was and is owed under these plans.

## COUNT VII
## WAGE ACT (M.G.L. c. 149, §§148, 150)
### (Scott v. All Defendants)

100.  Plaintiff realleges and incorporates each of the paragraphs above as if fully restated herein.

101.  During his employment at Putnam, Mr. Scott deferred his salary, bonuses and other payable benefits via the deferred compensation plans offered by Defendants.

102.  These monies are "wages" under the Massachusetts Wage Act, M.G.L. c. 149, §148.

103.  Mr. Scott's employment with Putnam ended in December 2003.  Since that time, Mr. Scott has not been paid wages he is owed, specifically his deferred compensation, despite his requests that these amounts be paid.

104. Pursuant to M.G.L. c. 149, §150, Mr. Scott sent a Wage Act complaint form to the Massachusetts Attorney General's office. On July 7, 2011, Mr. Scott's counsel received a letter from the Massachusetts Attorney General's office, authorizing him to file his claims under the Wage Act.

105. Mr. Scott is entitled to recover treble the amount of the withheld wages, to be determined at trial, and his attorney's fees, pursuant to M.G.L. c. 149, §150.

## PRAYER FOR RELIEF

WHEREFORE, Justin M. Scott respectfully requests this Court:

A.      Enter judgment for Mr. Scott in the full amount of damages caused by Defendants' breach of contract, breach of the implied covenant of good faith and fair dealing, and under promissory estoppel and ERISA (29 U.S.C. §1132), as well as for multiple damages and attorney's fees for Defendants' violation of the Massachusetts Wage Act (M.G.L. c. 149, §§148, 150);

B.      Award Mr. Scott his costs and fees, including reasonable attorneys' fees, in prosecuting this action; and

C.      Grant such further relief and other orders as justice may require.

## JURY DEMAND

Plaintiff Justin M. Scott hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

JUSTIN M. SCOTT,

By his attorneys,


/s/ Megan C. Deluhery
Kevin T. Peters, Esq. (BBO# 550522)
Raymond P. Ausrotas (BBO# 640315)
Megan C. Deluhery, Esq. (BBO# 655564)
TODD & WELD, LLP
28 State Street
Boston, MA 02109
Tel: (617) 720-2626
Fax: (617) 227-5777

Dated: July 27, 2011

## CERTIFICATE OF SERVICE

I, Megan C. Deluhery, hereby certify that this document has been filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

Date: July 27, 2011

/s/ Megan C. Deluhery
Megan C. Deluhery