UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JUSTIN M. SCOTT                            :

               Plaintiff,      :     Civil Action
                               No. 11-11082-RWZ

     v.                                   :

PUTNAM, LLC D/B/A PUTNAM            :     **JURY TRIAL DEMANDED**
INVESTMENTS, PUTNAM INVESTMENTS,
INC., PUTNAM INVESTMENT              :
MANAGEMENT, LLC, MARSH &
MCLENNAN COMPANIES, INC., JOHN      :
DOE PLAN ADMINISTRATORS 1-12,
                               :

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PUTNAM INVESTMENT MANAGEMENT,       :
LLC, PUTNAM U.S. HOLDINGS I, LLC and
MARSH & MCLENNAN COMPANIES, INC.    :

         Counterclaim-Plaintiffs,      :

     v.                                   :

JUSTIN M. SCOTT                            :

        Counterclaim-Defendant.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS OF PUTNAM INVESTMENT MANAGEMENT, LLC AND PUTNAM U.S. HOLDINGS I, LLC

## COUNTERCLAIMS

Pursuant to Rule 13(a) of the Federal Rules of Civil Procedure, Counterclaim-

Plaintiffs Putnam Investment Management, LLC ("Putnam") and Putnam U.S. Holdings I, LLC

(together with Putnam, the "Putnam Entities") (Putnam U.S. Holdings I, LLC is the legal

successor to Putnam Investments, Inc. and Putnam, LLC), by their undersigned counsel,

counterclaim upon knowledge as to themselves and otherwise upon information and belief as follows:

<b><u>Introduction</u></b>

1.      These counterclaims seek recovery for the egregious breaches of fiduciary duty by Justin Scott, a former senior mutual fund portfolio manager at Putnam who brazenly engaged in improper trading for his own account in Putnam mutual funds -- including funds that he managed -- all the time knowing that his trading directly took money from the shareholders whose interests he was obligated to safeguard zealously.

2.      While Scott was a senior Putnam employee and a highly sophisticated portfolio manager for a number of Putnam mutual funds that invested in international equities, he knew he could "systematically exploit" mutual fund pricing by making rapid in-and-out trades, later known as market timing.  Scott admitted in writing that the profits from those trades came directly at the expense of the Putnam funds' long-term shareholders, whose interests it was his fiduciary obligation to protect.  In violation of his fiduciary duties, Scott engaged in dozens of market timing trades, many involving enormous sums (i.e., 14 that were for more than $1 million and three for more than $2 million).  Scott traded in the very Putnam funds that he managed. These transactions were a knowing effort by Scott to make money for himself by taking it from the shareholders in those funds, in conscious violation of his fiduciary duties.

3.      When Putnam came to fully understand the nature and extent of Scott's misconduct, it promptly terminated his employment.  Subsequently, Scott paid more than one million dollars in fines and restitution to settle a fraud action brought against him by the SEC based on this trading, and was banned from the mutual fund industry for a year.  Neither Putnam nor the SEC accepted Scott's litany of after-the-fact excuses.

4.     By these counterclaims, Putnam will hold Scott responsible for his flagrant breaches of his fiduciary duties.  Putnam seeks recoupment of: (i) the fines, legal fees and costs, lost profits and other injuries that Putnam suffered as a result of Scott's gross misconduct; (ii) the millions of dollars of compensation that Putnam paid Scott while he was in breach of his fiduciary duties; and (iii) the additional millions of dollars of legal fees and costs that Putnam advanced on Scott's behalf in connection with the SEC action against him.  Putnam also seeks a declaratory judgment that Scott has forfeited the balances in the deferred compensation plans that are the subject of his Second Amended Complaint; forfeiture is appropriate as a matter of law and pursuant to the plans' terms.

## Parties

5.     Counterclaim-Plaintiff Putnam is a Delaware limited liability company that provides investment related services to Putnam mutual funds and institutional investors.  Its principal place of business is One Post Office Square, Boston, Massachusetts.

6.     Counterclaim-Plaintiff Putnam U.S. Holdings I, LLC is a Delaware limited liability company, and its principal place of business is One Post Office Square, Boston, Massachusetts.  Putnam U.S. Holdings I, LLC is the legal successor to Putnam Investments, Inc. and Putnam, LLC, named defendants in Scott's Second Amended Complaint.

7.     Counterclaim-Defendant Justin M. Scott formerly was employed as a portfolio manager by Putnam, as described in more detail below.  On information and belief, Scott resides in Greenwich, Connecticut and Marblehead, Massachusetts.

## Jurisdiction And Venue

8.     This Court has jurisdiction over these Counterclaims pursuant to 28 U.S.C. § 1367(a), because they arise out of the transaction or occurrence that is the subject matter of Scott's claim and must be brought in this action in accordance with Federal Rule of Civil

Procedure 13(a).  In particular, Scott contends that he is entitled to amounts of deferred

compensation withheld from him after he was terminated for market timing in Putnam funds, and

Putnam is counterclaiming to obtain a determination that, because of such market timing, Scott is

not entitled to these or any other amounts, and indeed is liable to Putnam for injuries and

damages that his market timing caused.

9.     This Court has personal jurisdiction over Scott because he commenced

this action in this district.

10.     Venue for these Counterclaims is proper within this district because the

Counterclaims arise from the facts and circumstances alleged in the Second Amended Complaint

filed in this district.

### Factual Allegations

### Scott Owed Fiduciary Duties To Putnam
### And To Putnam Mutual Fund Shareholders

11.     Putnam, together with its affiliates, is an investment management firm

located in Boston, Massachusetts.  Putnam is the registered investment adviser to the Putnam

mutual funds.

12.     Putnam employs portfolio managers to make investment decisions in

furtherance of each mutual fund's stated objectives, set forth in its prospectus.  Portfolio

managers have discretion to buy and sell securities for the fund.  They owe a fiduciary duty to

mutual fund shareholders of utmost good faith, and are at all times required to act in the

shareholders' best interest.  A portfolio manager cannot undertake transactions for personal gain

that are injurious to the shareholders in the mutual funds that he or she manages.  Nor may a

Putnam portfolio manger seek personal profit by trading at the expense of shareholders in any

other Putnam mutual funds.

13.     Scott was a senior portfolio manager at Putnam for approximately fifteen years. He was at all times extremely sophisticated, and he held himself out as such. The series of positions that he held at Putnam all entailed significant responsibility for making investment decisions on behalf of Putnam mutual fund shareholders, as their fiduciary.

14.     Scott's initial title was Vice President, Equity Portfolio Manager, and he worked in the International Equity Group, where he was responsible for day-to-day management of non-U.S. equity portfolios. He was responsible for researching and analyzing securities, and for making decisions involving asset allocation and equity selections.

15.     Scott became a Managing Director at Putnam and the director of the International Equity Group approximately six years later. By this time, he was the second most senior Putnam investment professional managing international mutual funds. In ensuing years, until his termination, although Scott's title periodically changed, he remained one of the most senior Putnam employees overseeing its international mutual funds. At all times, Scott was charged with the critical responsibility of managing tens of <u>billions</u> of dollars invested by <u>millions</u> of individuals who purchased Putnam mutual funds as long-term investments. He personally supervised the process by which investments were researched, selected and purchased for the funds' portfolios.

16.     In light of Scott's positions and responsibilities, he at all times owed fiduciary duties to Putnam and to Putnam mutual fund shareholders, especially (but not only) to the shareholders of the funds he managed.

17.     Scott was a portfolio manager for at least nine Putnam mutual funds, including: (i) the Europe Equity Fund; (ii) the Global Equity Fund; (iii) the International Capital Opportunities Fund; (iv) the International Equity Fund; (v) the International Fund; (vi) the

International Growth and Income Fund; (vii) the Vista Fund; (viii) the VT International Equity

Funds; and (ix) the VT Vista Fund.

18.     Scott was highly compensated for his services.  Between 1997 and 2002,

Scott's annual compensation, which included salary, bonus, and deferred compensation,

exceeded $5 million each year.  Between 1997 and 2003, Scott's compensation exceeded

$50,000,000.

### Scott Violated Putnam's Code Of Ethics

19.     In addition to his fiduciary obligations to Putnam and to Putnam mutual

fund shareholders, Scott also was required to adhere to the Putnam Code of Ethics and other

Putnam policies.  The Putnam Code of Ethics obligated Scott to act in the best interest of fund

shareholders at all times.  For example, the very cover page of the Putnam Code of Ethics,

operative when Scott was a portfolio manager, provided:

> It is the personal responsibility of every Putnam employee to avoid any
> conduct that could create a conflict, or even the appearance of a
> conflict, with our clients, or to do anything that could damage or erode
> the trust our clients place in Putnam and its employees.

(Putnam Code of Ethics, cover page.)

20.     At all relevant times, the Putnam Code of Ethics also expressly prohibited

employees from engaging in activities that placed their interests in conflict with those of Putnam

and Putnam's clients; i.e., shareholders in Putnam funds.  For example, the Putnam Code of

Ethics provided:

> No Putnam employee shall conduct herself in a manner which is contrary to the
> interests of, or in competition with, Putnam or a Putnam client, or which creates
> an actual or apparent conflict of interest with a Putnam client.

(Putnam Code of Ethics, page 19.)

**In 1997, Scott Identified A Way To Systematically Exploit
Mutual Fund Pricing By Making Rapid In-And-Out Trades,
And He Admitted That Such Trading Harms Shareholders**

21.     Although there is no single standard definition, "market timing" generally

relates to short-term trading in mutual funds to take advantage of "stale" prices of mutual fund

shares. As the United States Supreme Court recently explained:

> Market timing is a trading strategy that exploits time delay in mutual funds' daily
> valuation system.  The price for buying or selling shares of a mutual fund is
> ordinarily determined by the next net asset value (NAV) calculation after the
> order is placed.  The NAV calculation usually happens once a day, at the close of
> the major U.S. markets.  Because of certain time delays, however, the values used
> in these calculations do not always accurately reflect the true value of the
> underlying assets.  For example, a fund may value its foreign securities based on
> the price at the close of the foreign market, which may have occurred several
> hours before the calculation. But events might have taken place after the close of
> the foreign market that could be expected to affect their price.  If the event were
> expected to increase the price of the foreign securities, a market-timing investor
> could buy shares of a mutual fund at the artificially low NAV and sell the next
> day when the NAV corrects itself upward.

Janus Capital Grp., Inc. v. First Derivative Traders, 131 S. Ct. 2296, 2300 n.1 (U.S. 2011).  The

Supreme Court also explained that "[a]lthough market timing is legal, it harms other investors in

the mutual fund." Id. at 2300.

22.     Scott recognized, long before others at Putnam and within the industry,

that market timing trading directly and negatively impacted long-term fund shareholders.  In his

own words, Scott stated that the mutual funds he managed were subject to "systematic

exploitation" through market timing trades.

23.     For example, years before it became understood that the market timers'

profits were paid by long-term investors, Scott sent an email expressing his concern about "a

very high level of churn" in Putnam's international funds.  Scott specifically recognized that

market timing harmed a mutual fund's performance, and that market timers in a fund were

making money at the expense of its long-term shareholders:

> <u>My real concern</u> remains that there may be a <u>systematic exploitation</u> of our
> pricing system.  Buying our funds at previous days close after the US market is up,
> or selling at previous days close after the US market is down.  If there are 3rd
> parties who have figured this out, then they will be <u>making a lot of money at the</u>
> <u>expense of our performance and at the expense of our shareholders</u>.

(Emphasis added.)  One day later, Scott suggested, as a means of deterring market timing,

disallowing shareholder exchanges between Putnam funds that were more frequent than one

every six weeks.

24.    Scott continued to recognize the harms of market timing trading.  For

example, more than two years later, Scott requested an examination into potential frequent

trading in the International Voyager Fund, a Putnam international mutual fund within his

responsibilities.  He was described in an email as having "major anxst" about the issue.

25.    Likewise, Scott stated his concern that the performance of a Putnam

mutual fund over which he had managerial responsibilities, the Asia Pacific Variable Trust, was

"substantially negatively impacted" by market timing.

### <u>Scott's Market Timing Trading And Its Effects</u>

26.    Outrageously, despite his knowledge that market timing took money from

long-term shareholders, Scott engaged in the very market timing that he strongly criticized.

27.    Between 1997 and 2003, Scott engaged in at least <u>50</u> "round trip" trades

where there were matching purchase and sale transactions in a Putnam mutual fund in <u>fewer than</u>

<u>ten days</u>.  On <u>24</u> of these occasions, Scott bought shares on one day and sold them the very next

day.  In addition, Scott made <u>27</u> round trip trades in funds he managed.

28.    Scott's improper trades were for huge sums.  Scott made trades for

hundreds of thousands of dollars, including 14 that were for more than $1 million and three for

more than $2 million.  For example, Scott bought shares worth $3,326,938.20 of the

International Equity Fund (a fund he managed) on March 29, 2000 and then redeemed
$3,475,441.61 on April 4, 2000, for a profit of $148,503.41.

29.     On April 18, 2000, Scott purchased $900,000 in the International Equity
Fund, which he then redeemed on the very next day for $915,211.28 -- a profit of more than
$15,000 that came out of the pockets of Putnam mutual fund shareholders -- the very
shareholders he had a fiduciary duty to protect.  Also on April 18, 2000, Scott made three
purchases through three different accounts into the International Capital Opportunities Fund, and
then made three sales the very next day, April 19, as shown in the following table:

| Apr. 18 Purchases | Apr. 19 Redemptions |
|---|---|
| $544,026.26 | $556,370.80 |
| $791,020.37 | $808,969.49 |
| $650,000.00 | $664,749.20 |

Scott's profits from these improper trades exceeded $45,000 -- all at the expense of Putnam
mutual fund shareholders.

30.     Scott's misconduct was not limited to his market timing in mutual funds
described above.  Scott also dishonestly tried to effect an improper trade on April 14, 2000, a day
when the U.S. markets experienced a significant decline.  After the 4 p.m. trading deadline, Scott
called the Putnam department that was responsible for processing employee trades in retirement
accounts and attempted to make a trade.  The phone representative handling the call
appropriately did not permit Scott to make a post-deadline trade.  Scott asserted that he had been
on hold for more than 30 minutes (which was, in effect, a claim that he had called before 4 p.m.),
but subsequent investigation showed that he had first called after 4 p.m., not before.

31.     Scott's improper conduct contributed substantially to the enormous damage that market timing caused Putnam to incur.  In late 2003, the U.S. Securities and Exchange Commission ("SEC") commenced an investigation into marketing timing at a number of mutual fund complexes, including Putnam.   The SEC and Massachusetts Securities Division ("MSD") brought civil enforcement actions against Putnam, which Putnam settled by agreeing to pay substantial fines and to reimburse all affected mutual fund shareholders for any losses.  In imposing draconian remedies on Putnam, the SEC and MSD pointed specifically to Scott's improper trading, including in funds that he managed.  As discussed below, Scott was also separately sued by the SEC.  The penalties and repercussions that Putnam incurred as a result of Scott's and others' wrongdoing exceeded $190 million.

32.     In addition, Scott's misconduct contributed substantially to Putnam losing a significant amount of business and goodwill.  When the SEC brought an action in the fall of 2003 against Scott based on his market timing, Putnam suffered from an overwhelming amount of negative public attention.  When portfolio manager market timing, including Scott's, was disclosed, Putnam's shareholders punished the company, and it experienced unprecedented withdrawals, losing $45 billion in assets between October 2003 and March 2004 alone.  Thousands of shareholders contacted Putnam to personally express their outrage.  Examples of shareholder submissions to Putnam's website from October and November 2003 illustrate this shareholder response:

- "your firm is a disgrace.  I am embarrassed for you.  Your own managers don't have enough confidence to keep their own money in their own funds.  Instead, they take advantage of an arbitrage situation at the expense of their paying shareholders. . . ."

- "As a Putnam investor I just want to express my outrage at the unethical and possibly illegal conduct on the part of some of Putnam's fund managers. . . ."

- "You should be ashamed.  I trusted my kids small college fund with Putnam.  I am tired of the arrogant greed."

- "I just want your company to know that in view of your managers involved with short-term trades in at the expense of shareholders in your company that I will never own any investment that you have ever again."

## The SEC Sued Scott, Who Was
## Promptly Terminated By Putnam

33.       On October 27, 2003, the SEC brought a civil action against Scott and

another Putnam employee for their market timing trading, captioned SEC v. Scott, No. 03-cv-

12082-EFH (D. Mass. filed Oct. 27, 2003).  The MSD also brought a regulatory action against

Scott.

34.       Scott was placed on administrative leave on October 27, 2003, and was

terminated on December 1, 2003.  At the time, although Putnam determined that grounds existed

to deem Scott's termination as for cause, it did not do so (it did not characterize the termination at

all), and instead it refrained from doing so until the resolution of the SEC action against him in

the event that any exculpatory facts surfaced in that action.  Scott told Putnam that he had done

nothing wrong.

## Putnam Was Required To Advance
## Approximately $3 Million In Legal Fees To Scott

35.       After Putnam terminated Scott, it was required to advance him

approximately $3 million to pay for his legal fees and costs in defending the SEC and MSD

actions.  This advancement was made pursuant to his demand, in accordance with the terms of

The Limited Liability Company Agreement Of Putnam Investment Management, LLC (the "PIM

LLC Agreement").  Although initial advancement of legal fees was mandatory, the PIM LLC

Agreement allows for advanced legal fees to be recouped "following a later determination" that

there was no entitlement to indemnification.

36.     Prior to receiving the advancement, Scott executed an "Undertaking For Advancement Of Expenses," dated January 23, 2004 (the "Undertaking").  A true and correct copy of the undertaking is attached as Exhibit A.  In the Undertaking, Scott agreed to repay amounts advanced to him if it was later determined that he was not entitled to be indemnified because his actions either were not "in good faith" or "on behalf of the company."

37.     Scott's market timing of his own money, in his own accounts, for his own financial gain, which he knew to be a direct harm to Putnam and its shareholders, was neither "in good faith" nor "on behalf of the company."

38.     On or about July 20, 2007, Putnam sent Scott's counsel a letter informing him that he was not entitled to indemnification and demanding that Scott repay to Putnam the fees and expenses previously advanced.  Scott has not repaid the monies advanced.

### After Scott Was Fined And Banned From The Mutual Fund Industry By The SEC, Putnam Notified Him That His Termination Was For Cause

39.     Scott litigated against the SEC's claims from 2003 until 2007, when, shortly before trial was scheduled to begin, he entered into a settlement.  To resolve the case, he paid a civil penalty of $400,000 and restitution in the amount of $648,914 (including interest), and he was suspended from association with any investment adviser.  Putnam paid no part of these monies.

40.     Following the resolution of the SEC's claims against Scott, and in light of the absence of any exculpatory evidence emerging, Putnam notified Scott by letter dated July 20, 2007 that his termination was for cause.

### Much Of Scott's Deferred Compensation Is Expressly Subject To Forfeiture Because His Termination Was For Cause

41.     Many of the deferred compensation and retirement plans in which Scott participated, and on which his Second Amended Complaint is premised, contain forfeiture

provisions that expressly provide that a participant forfeits plan balances when terminated "for cause."  Scott's market timing in Putnam mutual funds, including mutual funds he managed, easily satisfies the "cause" definition under these plans.

42.     For example, the Putnam Investments Trust Equity Partnership Plan, under which Scott bases claims (see Am. Compl. ¶¶ 16(i), (ii)), defines "cause" to include "willful misconduct in the performance of the duties of [employee's] position, . . . violation of the Putnam Code of Ethics, violation of rules and regulations issued by any regulatory authority, breach of fiduciary duty or breach of trust, willful violation of an important Putnam policy, . . . or any other action likely to bring substantial discredit to Putnam."  Scott's improper trading meets each of these criteria.

43.     Other deferred compensation and retirement plans under which Scott bases claims contain a substantively identical definition of "cause," including:  (i) the Putnam Investments, Inc. Partners Incentive Compensation Plan (the "Partners Plan"), (ii) the Putnam Investments, Inc. Profit Growth Incentive Compensation Plan (the "Profit Growth Plan"), (iii) the Putnam Investments, LLC Voluntary Deferral Plan (the "VDP"), and (iv) the 2001 Executive Deferred Bonus Plan, which was part of the 2001 Executive Deferred Co-Investment Program ("EDCIP").  Scott's balances in these plans likewise are forfeitable because he was terminated for cause.

## COUNT I

### (Declaratory Judgment Counterclaim For Forfeiture Of Deferred Compensation Plan Balances With Express Forfeiture Provisions)

44.     The Putnam Entities incorporate their allegations contained in the paragraphs above as if fully set forth herein.

45.     Several of the deferred compensation and retirement plans in which Scott maintained balances at the time of his termination, which are the subject of Scott's Second Amended Complaint, contained a forfeiture provision expressly providing that a plan participant forfeits some or all of the plan balances when terminated "for cause" or for "willful misconduct."

46.     Under the terms of the deferred compensation and retirement plans containing forfeiture provisions, Putnam or Putnam U.S. Holdings I, LLC, as applicable, had sole discretion to interpret and apply their terms.

47.     Scott's market timing in his own accounts, at the expense of Putnam mutual fund shareholders, warranted for cause termination on multiple independent grounds, and it constituted willful misconduct.

48.     Accordingly, the Putnam Entities seek a declaratory judgment that Scott's balances under the deferred compensation and retirement plans are forfeited consistent with the plan terms because he was appropriately terminated "for cause" and engaged in "willful misconduct."

## COUNT II

### (Breach Of Contract Counterclaim For
### Failure To Repay Legal Fees Advanced To Scott)

49.     Putnam incorporates its allegations contained in the paragraphs above as if fully set forth herein.

50.     Scott executed an "Undertaking For Advancement Of Expenses," dated January 23, 2004.  By signing the Undertaking, Scott agreed to repay amounts advanced to him if it was later determined that he was not entitled to be indemnified by Putnam for the expenses and costs incurred.

51.     Pursuant to the Undertaking, Putnam advanced legal fees and expenses to Scott in an amount to be proven, of approximately $3,000,000.

52.     The PIM LLC Agreement's indemnification provision states: "[t]o the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any costs and expenses (including attorneys' fees and disbursements) . . . incurred . . . by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company."  PIM LLC Agreement ¶ 19.

53.     Scott's market timing of his own money, in his own accounts, for his own financial gain, which he knew to be contrary to the interests of Putnam and its shareholders, was not "in good faith."

54.     Scott's market timing of his own money, in his own accounts, for his own financial gain, which he knew to be contrary to the interests of Putnam and its shareholders, was not "on behalf of the company."

55.     Accordingly, Scott has no contractual right to indemnification and Putnam is entitled to recover all monies advanced to him pursuant to the Undertaking, plus interest.

## COUNT III

**(Breach Of Fiduciary Duty Counterclaim
To Recover Damages Caused By Scott)**

56.     Putnam incorporates its allegations contained in the paragraphs above as if fully set forth herein.

57.     As a highly compensated portfolio manager entrusted to manage the money of millions of individuals and institutional investors who invested in Putnam mutual funds, Scott occupied a position of trust and confidence at Putnam.

58.     By virtue of his position of trust and confidence at Putnam, Scott owed a duty of loyalty to Putnam and was obligated to protect Putnam's interests.

59.     Scott's market timing, described above, constituted a breach of his duty of loyalty by knowingly pursuing personal profit at the expense of Putnam and its mutual fund shareholders.

60.     Scott's breach of fiduciary duty directly caused Putnam to incur hundreds of millions of dollars in damages, including penalties and reparations exceeding $190 million paid to the SEC and Massachusetts Division of Securities, and loss of business and goodwill.

61.     Putnam is entitled to recoup the damages, in an amount to be proven, caused by Scott's breach of fiduciary duty.

## COUNT IV

### (Breach Of Fiduciary Duty Counterclaim
### To Recover Compensation Paid To Scott)

62.     Putnam incorporates its allegations contained in the paragraphs above as if fully set forth herein.

63.     As a highly compensated portfolio manager entrusted to manage the money of millions of individuals and institutional investors who invested in Putnam mutual funds, Scott occupied a position of trust and confidence at Putnam.

64.     By virtue of his position of trust and confidence at Putnam, Scott owed a duty of loyalty to Putnam and was obligated to protect Putnam's interests.

65.     Scott's market timing, described above, constituted a breach of his duty of loyalty by knowingly pursuing personal profit at the expense of Putnam and its mutual fund shareholders.

66.     During the period from 1997 through 2003, Putnam paid compensation to Scott in amounts in excess of $50 million, including the balances in the deferred compensation plans that are the subject of Scott's Second Amended Complaint.

67.     Scott is not entitled to retain the compensation that he was paid for the period during which he was in breach of his fiduciary duty, and Putnam is entitled to recoup Scott's compensation, plus interest.

## COUNT V

### (Declaratory Judgment Counterclaim For Forfeiture Of Deferred Compensation Plan Balances Under The Doctrine Of Equitable Forfeiture)

68.     The Putnam Entities incorporate their allegations contained in the paragraphs above as if fully set forth herein.

69.     For the reasons stated herein, Scott's market timing in his own accounts, at the expense of Putnam mutual fund shareholders, was a breach of fiduciary duty.

70.     Therefore, Scott is not entitled, under the doctrine of equitable forfeiture, to retain or receive compensation from Putnam or MMC, including balances in any deferred compensation and retirement plans, including without limitation those without express forfeiture provisions.

71.     Accordingly, the Putnam Entities seek a declaratory judgment that Scott's balances in all deferred compensation and retirement plans are forfeited under the doctrine of equitable forfeiture.

## JURY DEMAND

The Putnam Entities demand a trial by jury on all claims so triable.

## RELIEF REQUESTED

WHEREFORE, with respect to their Counterclaims, the Putnam Entities respectfully request that this Court:

(a)    Grant the Putnam Entities judgment on each of their Counterclaims;

(b)    Declare that Scott's balances under those deferred compensation and retirement plans containing forfeiture provisions are forfeited, consistent with the applicable plan terms;

(c)    Declare that, under the doctrine of equitable forfeiture, Scott is not entitled to retain or receive balances in any deferred compensation and retirement plans, including without limitation those without express forfeiture provisions;

(d)    Award Putnam recovery of the legal fees and costs that it advanced on Scott's behalf in an amount to be proven, of approximately $3,000,000;

(e)    Award Putnam the compensation that was paid to Scott while he was in breach of his fiduciary duty;

(f)    Award Putnam the amount of damages caused by Scott's breach of fiduciary duty;

(g)    Award the Putnam Entities prejudgment interest and the costs of suit herein; and

(h)    Grant the Putnam Entities such other further relief as the Court deems just and proper.

## ANSWER

Having stated their Counterclaims, the Putnam Entities answer the Second Amended Complaint And Jury Demand (the "Complaint") upon knowledge as to themselves and otherwise upon information and belief as follows.

The first three unnumbered paragraphs of the Complaint are introductory, descriptive, and conclusory in nature, and are in violation of Federal Rule of Civil Procedure 10(b) (requiring that "a party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances"), and no response is required; if a response is required, the Putnam Entities deny that they have wrongfully withheld any of Plaintiff's earned compensation or breached any contractual or other legal obligation or duty to Plaintiff, or that they are liable to Plaintiff in any amount or at all; and the Putnam Entities aver that Plaintiff is liable as alleged in the Counterclaims filed herewith.

1.      The Putnam Entities have insufficient knowledge to admit or deny the allegations of Paragraph 1.

2.      The Putnam Entities deny the allegations of Paragraph 2.

3.      The Putnam Entities deny the allegations of Paragraph 3.

4.      The Putnam Entities deny the allegations of Paragraph 4, except that they admit that Putnam Investment Management, LLC is a Delaware limited liability company having its principal place of business at One Post Office Square, Boston, Suffolk County, Massachusetts and is a registered investment adviser.

5.      The Putnam Entities deny the allegations of Paragraph 5, except that they admit that Defendant Marsh & McLennan Companies, Inc. ("MMC") is a Delaware corporation having its principal place of business at 1166 Avenue of the Americas, New York, New York.

6.     The Putnam Entities have insufficient knowledge to admit or deny the allegations of Paragraph 6.

7.     The allegations of Paragraph 7 are descriptive only and no response is required.

8.     The Putnam Entities deny the allegations of Paragraph 8, except that they admit that Plaintiff was hired by Putnam in 1988 and that he worked initially in the International Equity Group.

9.     The Putnam Entities deny the allegations of the first sentence of Paragraph 9, except that they admit that when Plaintiff joined Putnam, IEG assets were approximately $40 million and total assets under management at Putnam were approximately $35 billion.  The allegations of the second sentence of Paragraph 9 are descriptive and vague and ambiguous, and no response is required.  The Putnam Entities deny the allegations of the third sentence of Paragraph 9, except that they admit that by 1994 IEG was managing approximately $4 billion in assets.  The Putnam Entities deny the allegations of the fourth sentence of Paragraph 9, except that they admit that Plaintiff was made Director of the International Equity Group in 1994.

10.     The Putnam Entities admit the allegations of the first sentence of Paragraph 10.  The allegations of the second sentence of Paragraph 10 are descriptive and no response is required.  The Putnam Entities admit the allegations of the third sentence of Paragraph 10.  The Putnam Entities have insufficient knowledge to admit or deny the allegations of the fourth sentence of Paragraph 10.

11.     The Putnam Entities deny the allegations of Paragraph 11, except that they admit that by 2000 the Global Core Group was managing approximately $100 billion in assets,

and that from time to time, Plaintiff consulted and/or provided assistance in connection with other portfolios.

12.    The Putnam Entities have insufficient knowledge to admit or deny the allegations of Paragraph 12.

13.    The Putnam Entities have insufficient knowledge to admit or deny the allegations of Paragraph 13.

14.    The Putnam Entities deny the allegations of Paragraph 14.

15.    The Putnam Entities admit the allegations of Paragraph 15.

16.    The Putnam Entities have insufficient knowledge to admit or deny the allegations of Paragraph 16, except that they admit that Plaintiff participated in: (i) The Putnam Investments Trust Equity Partnership Plan; (ii) The Putnam Equity Dividend Equivalent Voluntary Deferral Plan; (iii) The Putnam Investments Profit Sharing Retirement Plan; (iv) The Putnam Investments, LLC Executive Deferred Compensation Plan; (v) The Putnam Investments, Inc. Partners Incentive Compensation Plan; (vi) The Putnam Investments, Inc. Profit Growth Incentive Compensation Plan; (vii) The Putnam Investments, LLC Voluntary Deferral Plan; and (viii) The Executive Deferred Co-Investment Program.

17.    The first, second and third sentences of Paragraph 17 purport to characterize the MMC 2000 Employee Incentive and Stock Award Plan and the Putnam Investments Trust Equity Partnership Plan, and the Putnam Entities refer to those plans for their content.  The fourth sentence of Paragraph 17 purports to characterize the terms of a January 2002 memorandum issued by Lawrence Lasser, and the Putnam Entities refer to that memorandum for its content.

18.     The allegations of Paragraph 18 purport to characterize the Putnam Investments Profit Sharing Retirement Plan and the Putnam Investments, Inc. Executive Deferred Compensation Plan, and the Putnam Entities refer to those plans for their content.

19.     The Putnam Entities deny the allegations of Paragraph 19, except that to the extent that these allegations purport to characterize the Putnam Investments, Inc. Partners Incentive Compensation Plan or the Putnam Investments, Inc. Profit Growth Incentive Compensation Plan, the Putnam Entities refer to those plans for their content.

20.     The allegations of the first sentence of Paragraph 20 purport to characterize the Putnam, LLC Voluntary Deferral Plan and the MMC Cash Bonus Award Voluntary Deferral Plan, and the Putnam Entities refer to those plans for their content.  The Putnam Entities have insufficient knowledge to admit or deny the allegations of the second sentence of Paragraph 20.

21.     The allegations of the first sentence of Paragraph 21 purport to characterize the Putnam Equity Dividend Equivalent Voluntary Deferral Plan and the Putnam Entities refer to that plan for its content.  The Putnam Entities have insufficient knowledge to admit or deny the allegations of the second sentence of Paragraph 21.

22.     The allegations of Paragraph 22 purport to characterize the Executive Deferred Co-Investment Program, and the Putnam Entities refer to that program for its content.

23.     The allegations of Paragraph 23 are legal conclusions to which no response is required.  To the extent that the Complaint purports to characterize the content of one or more of the deferred compensation plans sponsored by the Defendants, the Putnam Entities refer to those plans for their stated terms.

24.     The Putnam Entities deny the allegations of the first sentence of Paragraph 24, except that they admit that Plaintiff was awarded stock, options, bonuses and profit sharing, and that he participated in deferred compensation plans sponsored by the Putnam Entities.  The Putnam Entities deny the allegations of the second and third sentences of Paragraph 24, except that they admit that one of the purposes of Putnam's deferred compensation program was to retain personnel.  The Putnam Entities deny the allegations of the fourth sentence of Paragraph 24, except that they admit that in certain instances Putnam encouraged employees to contribute to these plans.  To the extent that fourth sentence of Paragraph 24 purports to characterize the terms of a January 2002 memorandum issued by Lawrence Lasser, the Putnam Entities refer to that memorandum for its content.

25.     Paragraph 25 contains legal conclusions to which no response is required; if a response is required, the Putnam Entities deny the allegations of Paragraph 25.  To the extent that the allegations of Paragraph 25 purport to characterize the content of one or more of the deferred compensation plans sponsored by the Defendants, the Putnam Entities refer to those plans for their stated terms.

26.     The first, second and fourth sentences of Paragraph 26 purport to characterize the content of one or more of the deferred compensation plans sponsored by the Defendants, the Putnam Entities refer to those plans for their stated terms.  The Putnam Entities deny the allegations of the third sentence of Paragraph 26, except that they admit that in certain instances administrative personnel processed allocation requests.

27.     Paragraph 27 contains legal conclusions to which no response is required; if a response is required, the Putnam Entities deny the allegations of Paragraph 27.  To the extent that the allegations of Paragraph 27 purport to characterize the content of one or more of the

deferred compensation plans sponsored by the Defendants, the Putnam Entities refer to those plans for their stated terms.

28.     The Putnam Entities admit the allegations of the first sentence of Paragraph 28.  The Putnam Entities deny the allegations of the second and third sentences of Paragraph 28, except that, to the extent that these allegations purport to characterize the terms of notices sent in 1997, the Putnam Entities refer to those notices for their content.  The Putnam Entities have insufficient knowledge to admit or deny the allegations of the fourth sentence of Paragraph 28.

29.     The Putnam Entities deny the allegations of Paragraph 29, except that they admit that while Plaintiff was employed by Putnam, he engaged in dozens of short-term in-and-out trades, of very large sums, including many in funds he managed.

30.     The Putnam Entities deny the allegations of Paragraph 30, except that they have insufficient knowledge to admit or deny the allegations of the fifth sentence of Paragraph 30.

31.     The Putnam Entities deny the allegations of Paragraph 31.

32.     The Putnam Entities deny the allegations of the first sentence of Paragraph 32.  The Putnam Entities admit the allegations of the second sentence of Paragraph 32 in that Mr. Scott met with Mr. Ferguson on or about June 14, 2000.  The Putnam Entities deny the allegations of the third sentence of Paragraph 32, except that they admit that Mr. Ferguson discussed Plaintiff's short-term in-and-out trades.   The Putnam Entities deny the remaining allegations of Paragraph 32.

33.     The Putnam Entities deny the allegations of Paragraph 33.

34.     The Putnam Entities deny the allegations of Paragraph 34.

35.     The Putnam Entities deny the allegations of the first sentence of Paragraph 35.  The Putnam Entities have insufficient knowledge to admit or deny the remaining allegations of Paragraph 35.

36.     The Putnam Entities have insufficient knowledge to admit or deny the allegations of Paragraph 36.

37.     The Putnam Entities have insufficient knowledge to admit or deny the allegations of Paragraph 37.

38.     The Putnam Entities have insufficient knowledge to admit or deny the allegations of Paragraph 38.

39.     The Putnam Entities admit the allegations of the first sentence of Paragraph 39.  The Putnam Entities have insufficient knowledge to admit or deny the allegations of the second and third sentences of Paragraph 39.

40.     The Putnam Entities admit the allegations of Paragraph 40.

41.     The Putnam Entities admit the allegations of Paragraph 41.

42.     The Putnam Entities admit the allegations of the first sentence of Paragraph 42.  The Putnam Entities deny the remaining allegations of Paragraph 42.

43.     The Putnam Entities deny the allegations of Paragraph 43.

44.     The Putnam Entities have insufficient knowledge to admit or deny the allegations of Paragraph 44.

45.     The Putnam Entities have insufficient knowledge to admit or deny the allegations of Paragraph 45.

46.     The Putnam Entities have insufficient knowledge to admit or deny the allegations of Paragraph 46.

47.     The Putnam Entities have insufficient knowledge to admit or deny the allegations of Paragraph 47.

48.     The Putnam Entities have insufficient knowledge to admit or deny the allegations of Paragraph 48.

49.     The Putnam Entities have insufficient knowledge to admit or deny the allegations of Paragraph 49.

50.     The Putnam Entities have insufficient knowledge to admit or deny the allegations of the first sentences of Paragraph 50, except that they admit that on October 28, 2003, the Securities and Exchange Commission commenced a civil administrative and cease and desist proceeding against Putnam, and on October 28, 2003, the Massachusetts Secretary of the Commonwealth commenced a civil administrative proceeding against Putnam. The remaining allegations of Paragraph 50 purport to characterize documents filed in the above proceedings, and the Putnam Entities refer to such filings for their content.

51.     The Putnam Entities admit the allegations of the first sentence of Paragraph 51.  The Putnam Entities deny the allegations of the second sentence of Paragraph 51.

52.     The Putnam Entities have insufficient knowledge to admit or deny the allegations of Paragraph 52.

53.     The Putnam Entities deny the allegations of the first sentence of Paragraph 53.  The Putnam Entities admit the allegations of the second sentence of Paragraph 53.

54.     The Putnam Entities deny the allegations of Paragraph 54, except that they admit that Charles E. Haldeman was named president and chief executive officer of Putnam Investments LLC on November 3, 2003, succeeding Lawrence J. Lasser.

55.     The Putnam Entities have insufficient knowledge to admit or deny the allegations of Paragraph 55.

56.     The Putnam Entities deny the allegations of the first sentence of Paragraph 56, except that they admit that Plaintiff was terminated on December 1, 2003.  The Putnam Entities deny the allegations of the second sentence of Paragraph 56, except that they admit that Putnam's Managing Director of Human Resources sent a letter to Plaintiff, and, to the extent that this sentence purports to characterize the termination letter, the Putnam Entities refer to that letter for its content.

57.     The Putnam Entities have insufficient knowledge to admit or deny the allegations of Paragraph 57.

58.     The Putnam Entities deny the allegations of the first sentence of Paragraph 58, except that they admit that in February 2004, Putnam sent a letter to Plaintiff, and the Putnam Entities refer to the letter for its content.  The Putnam Entities have insufficient knowledge to admit or deny the remaining allegations of Paragraph 58.

59.     The Putnam Entities have insufficient knowledge to admit or deny the allegations of Paragraph 59.

60.     The Putnam Entities deny the allegations of Paragraph 60, except that to the extent that Plaintiff is referring to a written demand, the Putnam Entities refer to that written communication for its content.

61.     The Putnam Entities deny the allegations of Paragraph 61, except that they admit that in 2007 Plaintiff withdrew certain amounts from the Putnam Investments Profit Sharing Retirement Plan.

62.     The Putnam Entities deny the allegations of Paragraph 62, except that they admit that in or around July 2007, Putnam placed a "for cause" termination letter in Mr. Scott's personnel file; the Putnam Entities refer to the letter for its content.

63.     The allegations of Paragraph 63 contain legal conclusions to which no response is required; if a response is required, the Putnam Entities deny the allegations as they relate to Plaintiff.

64.     The allegations of Paragraph 64 contain legal conclusions to which no response is required; if a response is required, the Putnam Entities deny the allegations.

65.     The Putnam Entities have insufficient knowledge to admit or deny the allegations of the first or fourth sentences of Paragraph 65.  The Putnam Entities deny the remaining allegations of the second sentence of Paragraph 65, except that to the extent that these allegations purport to characterize the content of one or more of the deferred compensation plans sponsored by the Defendants, the Putnam Entities refer to those plans for their stated terms.

66.     The Putnam Entities deny the allegations of Paragraph 66.

67.     The Putnam Entities deny the allegations of Paragraph 67, except admit that Plaintiff, another former Putnam employee, Putnam, LLC and MMC entered into a Mutual Tolling Agreement, which was terminated on December 21, 2010, and to the extent that these allegations purport to characterize the content the Mutual Tolling Agreement, the Putnam Entities refer to that agreement for it stated terms.

68.     The Putnam Entities incorporate their answers and averments contained in the paragraphs above as if fully set forth herein.

69.     The allegations of Paragraph 69 contain legal conclusions to which no response is required; if a response is required, the Putnam Entities deny the allegations.

70.     The Putnam Entities deny the allegations of Paragraph 70.

71.     The Putnam Entities deny the allegations of Paragraph 71.

72.     The Putnam Entities deny the allegations of Paragraph 72.

73.     The Putnam Entities incorporate their answers and averments contained in the paragraphs above as if fully set forth herein.

74.     The allegations of Paragraph 74 contain legal conclusions to which no response is required; if a response is required, the Putnam Entities deny the allegations.

75.     The Putnam Entities deny the allegations of Paragraph 75.

76.     The Putnam Entities deny the allegations of Paragraph 76.

77.     The Putnam Entities deny the allegations of Paragraph 77.

78.     The Putnam Entities incorporate their answers and averments contained in the paragraphs above as if fully set forth herein.

79.     The allegations of Paragraph 79 contain legal conclusions to which no response is required; if a response is required, the Putnam Entities deny the allegations.

80.     The Putnam Entities deny the allegations of Paragraph 80.

81.     The Putnam Entities deny the allegations of Paragraph 81.

82.     The Putnam Entities deny the allegations of Paragraph 82.

83.     The Putnam Entities incorporate their answers and averments contained in the paragraphs above as if fully set forth herein.

84.     The Putnam Entities deny the allegations of Paragraph 84.

85.     The Putnam Entities deny the allegations of Paragraph 85.

86.     The Putnam Entities incorporate their answers and averments contained in the paragraphs above as if fully set forth herein.

87.     The Putnam Entities deny the allegations of Paragraph 87.

88.     The Putnam Entities deny the allegations of Paragraph 88.

89.     The Putnam Entities deny the allegations of Paragraph 89.

90.     The Putnam Entities deny the allegations of Paragraph 90.

91.     The Putnam Entities deny the allegations of Paragraph 91.

92.     The Putnam Entities deny the allegations of Paragraph 92.

93.     The Putnam Entities deny the allegations of Paragraph 93.

94.     The Putnam Entities incorporate their answers and averments contained in the paragraphs above as if fully set forth herein.

95.     The Putnam Entities admit the allegations of the first sentence of Paragraph 95.  The allegations of the second sentence of Paragraph 95 are descriptive only and no response is required.

96.     The Putnam Entities deny the allegations of Paragraph 96.

97.     The Putnam Entities deny the allegations of Paragraph 97.

98.     The Putnam Entities deny the allegations of Paragraph 98.

99.     The Putnam Entities deny the allegations of Paragraph 99.

100.    The Putnam Entities incorporate their answers and averments contained in the paragraphs above as if fully set forth herein.

101.    The Putnam Entities deny the allegations of the first sentence of Paragraph 101, except that they admit that Plaintiff participated in deferred compensation plans sponsored by the Putnam Entities.

102.    The Putnam Entities deny the allegations of Paragraph 102.

103.    The Putnam Entities admit the allegations of the first sentence of Paragraph 103.  The Putnam Entities deny the allegations of the second sentence of Paragraph 103.

104.    The Putnam Entities have insufficient knowledge to admit or deny the allegations of Paragraph 104.

105.    The Putnam Entities deny the allegations of Paragraph 105.

FURTHER, Defendants deny the allegations in the unnumbered paragraph of the Complaint beginning with the word "WHEREFORE" (including subparagraphs A through C thereof) and deny that Plaintiff is entitled to any relief whatsoever.  The Putnam Entities therefore request that the Complaint be dismissed with prejudice.

## AFFIRMATIVE DEFENSES

Having stated their Counterclaims and answered the Complaint, the Putnam Entities state their affirmative defenses as follows:

### First Affirmative Defense
(Failure To State A Claim)

1.    Each and every allegation and claim in the Complaint fails to state a claim upon which relief may be granted.

### Second Affirmative Defense
(Forfeiture Resulting From Plaintiff's Misconduct)

2.    Each and every allegation and claim in the Complaint is barred because Plaintiff was terminated for cause as a result of his misconduct and breaches of fiduciary duty, and balances in certain deferred compensation plans sponsored by the Putnam Entities were forfeited in accordance with their terms.

### Third Affirmative Defense
(Defendants Met Their Obligations)

3.  Each and every allegation and claim in the Complaint is barred because the Putnam Entities discharged or satisfied all of their contractual or other obligations to Plaintiff, if any.

### Fourth Affirmative Defense
(Contradiction Of Written Terms)

4.  Each and every allegation and claim in the Complaint is barred because Plaintiff seeks to contradict the express written terms of the deferred compensation plans sponsored by the Putnam Entities.

### Fifth Affirmative Defense
(ERISA Preemption)

5.  Plaintiff's state law claims as they relate to benefit plans governed by ERISA are barred by ERISA's preemption provisions, 29 U.S.C. §§ 1132(a)(1)(B) and 1144(a).

### Sixth Affirmative Defense
(Good Faith)

6.  Each and every allegation and claim in the Complaint is barred because the Putnam Entities at all times acted in good faith.

### Seventh Affirmative Defense
(No Damages)

7.  Each and every allegation and claim in the Complaint is barred because Plaintiff has not sustained any legally cognizable damages or injuries by virtue of any matter alleged in the Complaint.

**Eighth Affirmative Defense**
(Failure To Mitigate Damages)

8.      Each and every allegation and claim in the Complaint is barred because Plaintiff has failed to act reasonably to mitigate damages, if any.

**Ninth Affirmative Defense**
(Exclusive Remedy)

9.      If Plaintiff has suffered any damages from breaches of the deferred compensation plans sponsored by the Putnam Entities, which is denied, then any such alleged damages resulting are limited in whole or in part by the provisions of the deferred compensation plans establishing an explicit and exclusive remedy for such breaches.

**Tenth Affirmative Defense**
(Failure To Exhaust Administrative Remedies)

10.     This action as it relates to benefit plans governed by ERISA is barred because Plaintiff has failed to exhaust administrative remedies as required by ERISA § 503, 29 U.S.C. § 1133.

**Eleventh Affirmative Defense**
(Unclean Hands)

11.     Each and every allegation and claim in the Complaint is barred by the doctrine of unclean hands.

**Twelfth Affirmative Defense**
(Estoppel)

12.     Each and every allegation and claim in the Complaint is barred by the doctrine of estoppel.

### Thirteenth Affirmative Defense
(Waiver)

13.     Each and every allegation and claim in the Complaint is barred by the doctrine of waiver.

### Fourteenth Affirmative Defense
(Ratification)

14.     Each and every allegation and claim in the Complaint is barred by the doctrine of ratification.

### Fifteenth Affirmative Defense
(Release)

15.     Each and every allegation and claim in the Complaint is barred because Plaintiff has settled and released such claims.

### Sixteenth Affirmative Defense
(Statute Of Frauds)

16.     Each and every allegation and claim in the Complaint is barred by the statute of frauds.

### Seventeenth Affirmative Defense
(No Reasonable Reliance)

17.     Each and every allegation and claim in the Complaint is barred because Plaintiff could not have reasonably relied on any representation made by the Putnam Entities.

### Eighteenth Affirmative Defense
(Reservation of Rights)

18.     The Putnam Entities hereby give notice that they intend to rely upon such other and further defenses as may become available or apparent during pretrial proceedings in this action and hereby reserve all rights to amend this Answer and all such defenses.

## RELIEF REQUESTED

WHEREFORE, with respect to the Complaint, the Putnam Entities respectfully requests that this Court:

(a)     Grant the Putnam Entities judgment on all of Plaintiff's claims and dismiss the Complaint with prejudice;

(b)     Award the Putnam Entities their costs and attorneys' fees for the defense of this action; and

(c)     Grant the Putnam Entities such other further relief as the Court deems just and proper.

Dated:  August 10, 2011                           Respectfully submitted,
        Boston, Massachusetts

                                                    /s/ James R. Carroll
                                                  James R. Carroll (BBO #554426)
                                                  Peter Simshauser (BBO #665153)
                                                  Eben P. Colby (BBO #651456)
                                                  SKADDEN, ARPS, SLATE,
                                                      MEAGHER & FLOM LLP
                                                  One Beacon Street
                                                  Boston, Massachusetts 02108
                                                  (617) 573-4800
                                                  Email: james.carroll@skadden.com

                                                  Counsel for Defendants/Counterclaim-
                                                  Plaintiffs Putnam Investment Management,
                                                  LLC and Putnam U.S. Holdings I, LLC

## CERTIFICATE OF SERVICE

I, James R. Carroll, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on August 10, 2011.

Dated:  August 10, 2011                            /s/ James R. Carroll
                                                  James R. Carroll